UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              . Case No. 02-11505 (MFW)
                                    .
                                    .
NII HOLDINGS, INC. and              . 824 Market Street
NII HOLDINGS (DELAWARE), INC. .     . Wilmington, DE  19801
                                    .
              Debtors,              . October 22, 2002
. . . . . . . . . . . . . . . . . . . 12:30 P.M.

TRANSCRIPT OF MOTIONS
BEFORE THE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:                Richards, Layton & Finger, P.A.
                                By:  DANIEL DeFRANCESCHI, ESQ.
                                     PAUL N. HEATH, ESQ.
                                     REBECCA L. SCALIO, ESQ.
                                One Rodney Square
                                P.O. Box 551
                                Wilmington, DE   19899

                                Bingham, McCutcheon, LLP
                                By:  PATRICK J. TROSTLE, ESQ.
                                     WILLIAM F. GOVIER, ESQ.

For Nextel Communications,
Inc.,:                          Jones, Day, Reavis & Pogue
                                By:  PAUL E. HARNER, ESQ.
                                     JOHN W. EDWARDS, II, ESQ.
                                1900 Huntington Center
                                41 South High Street
                                Columbus, OH   43215-6113

                                Morris, James, Hitchens &
                                Williams, LLP
                                By:  BRETT D. FALLON, ESQ.

Proceedings recorded by electronic sound
recording, transcript produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey  08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311       Fax No.  (609) 587-3599**

APPEARANCES:   (continued)

For U.S. Trustee:                    U.S. Department of Justice
                                       Office of U.S. Trustee
                                     By:   JOSEPH J. McMAHON, ESQ.

For Cordillera Communications
Corp.:                               Davis, Graham & Stubbs, LLP
                                     By:   CHRISTOPHER RICHARDSON, ESQ.
                                           GLEN E. KRELLER, JR., ESQ.

                                     CHARLES J. BROWN, ESQ.

For Chase:                           Millbank, Tweed, Hadley &
                                     McCloy, LLP
                                     By:   DEIDRE ANN SULLIVAN, ESQ.

                                     Ashby & Geddes, P.A.
                                     By:   WILLIAM P. BOWDEN, ESQ.

For Bank of New York:                Emmet, Marvin & Martin
                                     By:   EDWARD ZUJKOWSKI, ESQ.

                                     Walsh, Monzack & Monaco
                                     By:   FRANCIS A. MONACO, ESQ.

For Motorola:                        Prickett, Jones & Elliott, P.A.
                                     By:   BRUCE E. JAMESON, ESQ.

For the Committee of
Unsecured Creditors:                 Saul Ewing, LLP
                                     By:   MARK MINUTI, ESQ.

                                     Kilpatrick, Stockton, LLP
                                     By:   DENNIS S. MEIR, ESQ.
                                           TODD C. MEYERS, ESQ.

For Ad Hoc Committee:                Milbank, Tweed, Hadley & McCloy
                                     By:   THOMAS R. KRELLER, ESQ.

Audio Operator:                      Jennifer M. Patone

# I N D E X

WITNESSES FOR THE DEBTOR                                      Page

STEPHEN SHINDLER

    Direct Examination by Mr. DeFranceschi                132
    Cross Examination by Mr. Richardson                   137
    Cross Examination by Mr. McMahon                      140
    Redirect Examination by Mr. DeFranceschi              142

WITNESSES FOR CORDILLERA

VINCENT MICHAEL FITZGERALD

    Direct Examination by Mr. Richardson                  155
    Cross Examination by Mr. DeFranceschi           170, 176
    Cross Examination by Mr. Edwards                      175
    Redirect Examination by Mr. Richardson                178

| EXHIBITS | | I.D. | EVD. |
|---|---|---|---|
| Cordillera 1 | NII 10K | | 77 |
| Cordillera 2 | Nextel 10K | | 77 |
| Cordillera 3 | Nextel 8K | | 77 |
| Debtor's A | Affidavit | | 97 |
| Debtor's B | Affidavit | | 97 |
| Debtor's C | Affidavit | | 97 |
| Nextel 1 | NII Holdings, Inc. Proof of Claim | 175 | 180 |
| Nextel 2 | NII Holdings Delaware Inc. Proof of Claim | 175 | 180 |

MOTIONS

2    Motion of the Acting U.S. Trustee pursuant to
    11U.S.C. Secs. 1125(b), 1126(b), 1126(d) and
    1126(e) for an Order (1)Designating Persons Who
    Executed Lock-Up Agreements, (2) Directing That
    the Ballots Cast by Such Persons Not be Counted,
    (3) Imposing Sanctions and/or (4) Granting Other
    Relief                                                  6

3    Motion to Subordinate Claim of Nextel Communications
    Inc. filed by Cordillera Communications Corp.          66

MOTIONS                                                    Page

4     Revised Third Amended Joint Plan of Reorganization
      of NII Holdings, Inc. and NII Holdings (Delaware),
      Inc.                                                    95

1          THE COURT:  Good morning.

2          MR. DeFRANCESCHI:  Good morning, Your Honor.

3          THE COURT:  Afternoon.

4          MR. DeFRANCESCHI:  Correct. Good afternoon, Your

5    Honor.  Dan DeFranceschi from Richards, Layton & Finger on

6    behalf of the debtors.

7          Your Honor, we have a very aggressive agenda today.

8    The first item on that agenda is the motion of the United

9    States Trustee seeking to designate votes pursuant to the lock-

10   up agreements and directing that those votes not be counted.

11         Your Honor, by the motion, the U.S. Trustee actually

12   also seeks to impose sanctions against the debtors with respect

13   to those agreements, a fact that's of particular importance

14   here, because I think as the hearing progresses Your Honor will

15   see there was no improper conduct here but rather --

16         THE COURT:  Well, should I hear from the U.S. Trustee

17   whose motion it is?

18         MR. DeFRANCESCHI:  Yes, Your Honor, I just wanted to

19   introduce that and let Your Honor know that the ad hoc

20   noteholder committee council will be her today as well, as will

21   -- as is Motorola and NCI, the other parties to the lock-up

22   agreements.

23         And with that, Your Honor, certainly Mr. McMahon

24   should present his motion.

25         THE COURT:  Thank you.

1    MR. McMAHON:  Your Honor, good afternoon. Joseph
2  McMahon for Donald Walton, the acting United States Trustee for
3  Region 3.

4    I'm going to be dividing my presentation into two
5  sections.  The first section is what I call the
6  characterization problem, which involves the question of
7  whether the consents to the lock-up agreements are temporally
8  characterized as pre-petition or post petition consents.

9    And then the second issue is whether or not there was
10  a solicitation of an acceptance of a plan under Section 1125B.

11    THE COURT:  Okay.

12    MR. McMAHON:  I'll start with the first section and
13  address that issue first.  The debtors take the position in
14  their objection to the U.S. Trustee's motion that to the extent
15  that consents to the lock-up agreements, which are attached to
16  Mr. Gilker's affidavit can be construed as acceptances.  They
17  were pre-petition acceptances.

18    Why is this argument important?  Well, under Section
19  1125(b) of the Bankruptcy Code solicitation is prohibited
20  during the post petition period prior to court approval of the
21  disclosure statement.

22    THE COURT:  Um-hum.

23    MR. McMAHON:  And under Section 1126(b) and Rule 3018
24  there is no prohibition per se on pre-petition solicitation,
25  and the plan proponent seeking to pre-pack a case as to

1  validate the pre-petition acceptances or rejections.

2       Based on the facts contained in the debtors and ad
3  hoc committee's objections and the accompanying Gilker
4  affidavit, the U.S. Trustee disagrees with the debtor's
5  position as to the timing of the acceptances by Motorola and
6  the noteholders.

7       The Gilker affidavit makes it clear that the debtors
8  extended a post petition offer to Motorola and the noteholders
9  to enter into the lock-up agreements. The noteholder and
10 Motorola signatures were not delivered until May 29th, 2002,
11 which was five days after the debtor's bankruptcy petitions
12 were filed.

13      Moreover, the effectiveness of the lock-up
14 agreements, if you look at the provision, Your Honor, they were
15 cross conditional upon the noteholders and Motorola entering
16 into the lock-up agreements on or before a certain date. They
17 contain that provision.

18      The noteholder Motorola agreements are made effective
19 as of May 29th. There were post petition communications
20 between the parties related to changes made to the lock-up
21 agreements. That's identified in Paragraph 14 of the debtor's
22 objection and Paragraph 19 of the ad hoc committee objection.

23      Further, the lock-up agreements contain a prior
24 negotiations provision which indicates that the lock-up
25 agreement and the term sheet supersedes all prior negotiations

1 | with respect to the subject matter of the lock-up.

2 |      Mr. Gilker, Paragraph 12 of his affidavit, states
3 | that it was, quote, "of paramount importance to the debtors,"
4 | parens, "and to all the key creditors, including NCI, Motorola
5 | and the noteholders," end parens, "that all the key parties
6 | contractually agree to support this transaction," period, end
7 | quote.

8 |      Ironically the contractual agreement becomes much
9 | less important to the debtors after the U.S. Trustee files a
10 | motion to designate certain votes.  There was no post petition
11 | solicitation, the debtors maintained, beginning at Page 18 of
12 | their objection, however, the facts indicate that there was a
13 | post petition solicitation.

14 |      Motorola's and the noteholders' contractual
15 | agreements were of paramount importance.  Mr. Gilker's own
16 | words.  To the extent that this Court disagrees with the U.S.
17 | Trustee's position and permits the debtors to advance their
18 | argument that the consents to the lock-up agreement should be
19 | validated as pre-petition acceptances, the U.S. Trustee
20 | believes that the debtors have not properly brought this issue
21 | before the Court.

22 |      In any pre-package case the debtor moves to approve
23 | the pre-petition disclosure and the votes cast pre-petition.
24 | In this case  no such motion has been filed.

25 |      The U.S. Trustee was put on notice for the first time

1 this past week that the debtors were asserting a safe harbor
2 defense under 11 U.S.C. Section 1126(b). Accordingly, the
3 debtors' factual defense, to the extent that it has merits,
4 warrants further examination.

5 Under 11 U.S. Section 1126(b) there's the threshold
6 issue of whether the solicitation was in compliance with
7 applicable non-bankrupt C regulation. And Your Honor's
8 confirmation opinion in <u>Zenith</u>, this Court suggested that non-
9 bankruptcy regulation for Section 1126(b)(1) purposes include
10 securities regulation.

11 If there is no such non-bankruptcy regulation then
12 under 11 U.S.C. Section 1126(b)(2) the voter must have been
13 supplied with adequate information as defined in Section
14 1125(a) of the code. In <u>In Re: The Southland Corp.</u>, that's a
15 Northern District of Texas case that was cited in the <u>Zenith</u>
16 opinion, the court ruled that a debtor seeking to approve pre-
17 petition acceptances under Section 1126(b)(2) had to initially
18 prove that there was no applicable non-bankruptcy regulation
19 relevant to the disclosure before making the adequate
20 information showing.

21 Regardless of the debtor's safe harbor defense, there
22 is a basis as a matter of law for designating the votes of NCI
23 and the noteholders today, accepting the debtor's arguments
24 that the acceptances of NCI and the noteholders were pre-
25 petition acceptances.

1    First, Federal Rule of Bankruptcy Procedure 3018(b)
2  states that a holder of a claim or interest who has accepted or
3  rejected a plan before the commencement of a case under the
4  Code shall not be deemed to have accepted or rejected the plan
5  if the Court finds, after notice and a hearing, that the plan
6  was not transmitted to substantially all creditors and equity
7  security holders of the same class, that an unreasonably short
8  time was prescribed for such creditors and equity security
9  holders to accept or reject the plan or that the solicitation
10  was not in compliance with 11 U.S.C. Section 1126(b).

11    In other words, Your Honor, under Rule 3018(b) the
12  debtors have the initial burden of demonstrating that
13  substantially all creditors in Class 6 had a copy of the plan
14  transmitted to them before attempting to pre-pack that class.

15    Under the facts contained in their own lock-up
16  agreements, the Gilker First Day affidavit and the Bloom
17  affidavit certifying the ballots, the debtors did not transmit
18  a plan to substantially all creditors in Class 6 pre-petition.
19  And that's with regard -- regardless of whether we measure the
20  -- substantially all creditors by the number of holders of a
21  dollar value of the holdings themselves.

22    If you take a look at the Bloom affidavit it contains
23  information which indicates that at least 480 entities voted on
24  the plan.  NCI and the noteholders represent a tiny fraction of
25  that total creditor class.

1    Further, if you do the analysis -- remember the $2.2
2  billion worth of bonds were lumped into Class 6.

3           THE COURT:  Um-hum.

4           MR. McMAHON:  And if you were to break out NCI's and
5  the noteholders' holdings on a dollar value amount it's my
6  estimate that approximately 800 million to a billion dollars of
7  value is still there after we take them out.  Therefore, under
8  either test, Your Honor, we believe that the debtors can't pre-
9  pack Class 6.

10          We further note that, Your Honor, if the Court adopts
11  the U.S. Trustee's position and characterizes the debtor's
12  efforts to obtain the Motorola lock-up agreements as an
13  improper post petition solicitation and designates the Motorola
14  votes on that basis, then the debtors are going to need Class 6
15  in order to confirm the plan under 11 U.S.C. Section
16  1129(a)(10).

17          THE COURT:  Um-hum.

18          MR. McMAHON:  There's only three impaired classes in
19  the plan, 2, 3 and 6.  If this Court designates 2 and 3 as
20  improper post petition solicitation, then they're going to need
21  6.  The post petition votes of Class 6, that is, in order to
22  confirm their plan.

23          Let me move to the second issue, Your Honor, which is
24  the solicitation under 11 U.S.C. Section 1125(b).

25          The debtors --

1      THE COURT: Before you do --

2      MR. McMAHON: -- sought to enter into lock-up.

3      THE COURT: Before you do, are you asserting that the

4 NCI vote came in post petition, or are you acknowledging that

5 that came in before the petition was filed?

6      MR. McMAHON: Your Honor, I am acknowledging that

7 that came in before the petition was filed. I concede that.

8      THE COURT: All right. Thank you. All right.

9      I'm sorry to interrupt.

10      MR. McMAHON: No, thank you.

11      Moving to the second section of my argument, which is

12 the solicitation under 11 U.S.C. Section 1125(b), the debtor

13 sought to enter into lock-up agreements with NCI, certain

14 noteholders and Motorola Credit Corporation. That's in

15 Paragraph 4 of the Gilker designation affidavit.

16      And the debtors did, in fact, enter into lock-up

17 agreements with those entities. They're attached as Exhibit C

18 to that Gilker designation affidavit.

19      The lock-up agreements bind the signatory creditors

20 to vote in favor of a plan of reorganization which is

21 consistent with the provisions of the term sheet attached as

22 Exhibit B to the Gilker designation affidavit.

23      Each of the lock-up agreements contain a provision

24 entitled specific performance. That provision states that,

25 quote, "It is understood and agreed by each of the parties

1 hereto that money damages would not be a sufficient remedy for
2 any breach of this agreement by any party, and each non-
3 breaching party shall be entitled to specific performance and
4 injunctive or other equitable relief as a remedy of such
5 breach," period, end quote.

6          The acting United States Trustee's position, Your
7 Honor, here today is that the debtors, by seeking creditor
8 consents to the lock-up agreements, were making a quote,
9 "specific request for an official vote," period, end quote.
10 That's the language from In Re: Snyder, the Utah case.

11          The lock-up agreements bind the signatory creditors
12 to vote in favor of a plan. The agreement obligated the
13 signatories to vote. Abstention was not an option. When each
14 of the signatory creditors received ballots that were mailed to
15 them with the solicitation package the debtors believed and
16 maintain today the creditor had no option but to perform their
17 obligations under the terms of the lock-up agreement.

18          Thus, in reality, the creditors had cast their votes
19 at the time they signed the lock-up agreements. Had any
20 creditor sought to do anything else, for example reject the
21 plan, the debtors assert that they would have been able to come
22 into this court and request an order that the rejecting ballot
23 was in breach of the lock-up agreement and should not be
24 counted as the creditors' vote. Rather, the official vote is
25 the acceptance they agreed to when they signed the lock-up

1   agreement.

2         The debtors challenge the United States Trustee's
3   position that there was a solicitation of an acceptance post
4   petition and cite three cases in support of their position.

5         The first of the three cases is <u>In Re: Pioneer</u>
6   <u>Finance Corp.</u>  That's 246 <u>Bankruptcy Reporter</u> 626 out of the
7   District of Nevada.  The <u>Pioneer Finance</u> case involved the
8   question of whether the pre-petition consents of bondholders
9   obtained pursuant to an exchange offer and consent to
10   solicitation constituted an acceptance of the plan under 11
11   U.S.C. Section 1126(b).

12         Thus, it is totally irrelevant to the question of
13   what constituted an improper solicitation in violation of
14   1125(b).

15         <u>Pioneer Finance</u> is factually distinguishable from the
16   instant case.  First, in Footnote number 6 to the opinion, the
17   Court specifically refused to determine whether the agreement,
18   embodied in the consent form, constituted a contract or to
19   consider the remedies, if any, that would be available if a
20   consenting noteholder failed to vote in favor of a plan.

21         The existence of that footnote suggests that the
22   consent form did not specifically identify any remedies that
23   might be available if a consenting noteholder failed to vote in
24   favor of the Pioneer Finance plan.

25         In this case we have an executed agreement where the

1 parties have identified specific performance and injunctive
2 relief as available remedies in the event of a breach.

3    In other words, the lock-up agreements on their face
4 suggest that the parties entered into a contract with the
5 intent of making the agreement enforceable by injunction among
6 other remedies in the event of non-performance.

7    The Pioneer case supports the U.S. Trustee's
8 position.  The plan proponent did the same thing the debtors
9 are trying to do here today, which is changing their mind and
10 belatedly trying to get approval of an offering as a pre-pack.

11    The Pioneer Court found that the pre-petition
12 disclosure process was inadequate.

13    The second case cited by the debtors is In Re:
14 Kellogg Square Partnership, 160 Bankruptcy Reporter 336.
15 That's out of the District of Minnesota.  What is interesting
16 about Kellogg Square is that part of the opinion which appears
17 immediately after the part cited by the debtors in Paragraph 23
18 of their objection to the Acting United States Trustee's
19 motion, which addresses the signatory creditors' rights under
20 the agreement in question.  Quote, "The result and status of
21 the agreement then is crucial.  Had the final Court approved
22 disclosure statement revealed information that materially bore
23 on District Energy's interest and had the debtor previously
24 failed to disclose that information to District Energy,
25 District Energy would have a right under general non-bankruptcy

1 law to repudiate the agreement via recission, then to cast a
2 rejecting ballot, period, end quote.

3          The Kellogg opinion indicates that the Court believed
4 that some further action was necessary for the creditors' vote
5 to count. That's not the case here.

6          In the instant case we have lock-up agreements which
7 provide no such express out for non-disclosure to the signatory
8 creditors. Again, nothing in the Kellogg Square opinion
9 appears to suggest that the agreement that is the subject of
10 that opinion contained a provision which entitled the debtor to
11 injunctive relief.

12          Finally, the debtors cite the Third Circuit's ruling
13 in Century Glove First American Bank. In Century Glove the
14 Third Circuit held that, quote, "A party does not solicit
15 acceptances when it presents a draft plan for the consideration
16 of another creditor, but does not request that creditor's vote.

17          That's precisely the point, however, in this case,
18 Your Honor. By seeking to lock up the signatory creditors'
19 votes the debtors made a specific request for an official vote.
20 There's nothing in the future about the lock-up agreement. The
21 signatory creditors pledged their official vote at the time the
22 lock-up agreements were entered into.

23          Your Honor, we submit that the relief granted in --
24 sought in the United States Trustee's motion, and we would cede
25 the podium at this time to the debtor unless you have further

1 questions.

2 THE COURT: No, thank you.

3 MR. DeFRANCESCHI: Thank you, Your Honor. I think it
4 was very carefully done that Mr. McMahon attempted to put the
5 cart behind the horse here. The position of the debtors in
6 this case is before you determine whether there was a
7 solicitation, you have to make sure you satisfy the
8 requirements of 1125 or 1126. And with respect to both
9 provisions of the code, it must be an acceptance of rejection
10 of a plan that would -- that was in fact solicited in order for
11 those sections to apply.

12 The U.S. Trustee has offered no facts to support that
13 there was any improper solicitation of an acceptance of plan
14 here, save one fact. And that one fact is that the Motorola
15 and the noteholder agreements, the two lock-up agreements that
16 he was discussing, are dated as of May 29th.

17 The debtors submit that that fact alone, in light of
18 the facts which I will present to Your Honor in a moment, lead
19 to several conclusions that I think are inescapable here, but
20 first and foremost that there was no acceptance of a plan that
21 was solicited by the particular documents.

22 Your Honor, I -- the debtors filed --

23 THE COURT: Doesn't the lock-up agreement require
24 that they vote for the plan?

25 MR. DeFRANCESCHI: Your Honor, what this lock-up

1 agreement provides for, and I think it's interesting that the

2 <u>Pioneer</u> case was mentioned in the U.S.T.'s argument. What this

3 plan provides for, and I think it's very important that we walk

4 through the entirety of the lock-up agreements. It is improper

5 in this situation to focus just on that one provision and

6 ignore the rest of the agreement.

7         This agreement, if it is read in total, is entirely

8 consistent with <u>Century Glove</u>, which the Court is well aware

9 provided that the Third Circuit in construing this section of

10 the Code, 1125, construed it in a manner to favor settlements,

11 to favor creditor negotiations, found no principle difference

12 between negotiations and solicitation of future acceptances.

13 It's right there in the case.

14         The <u>Pioneer</u> decision is, although from another

15 circuit, entirely consistent with that, and its telling, the

16 language in that situation. And what was attempted to be done

17 there -- it's telling how it supports us.

18         The language -- <u>Pioneer</u> --

19         THE COURT:  Well, wait a minute. Let's go to the

20 Third Circuit.

21         MR. DeFRANCESCHI:  Yes.

22         THE COURT:  <u>Century Glove</u> dealt with a creditor that

23 sent a draft plan.

24         MR. DeFRANCESCHI:  Yup.

25         THE COURT:  It didn't say, "Sign on the dotted line

1  that you agree to support my plan."

2          MS.  SCALA:  Absolutely.

3          THE COURT:  Let's start with the Bankruptcy Code.

4          MR. DeFRANCESCHI:  Yes.

5          THE COURT:  It says you cannot solicit an acceptance

6  or rejection of a plan.

7          MR. DeFRANCESCHI:  Yes.

8          THE COURT:  If the lock-up agreement isn't a

9  solicitation of an acceptance or a rejection of the plan, what

10 is?

11         MR. DeFRANCESCHI:  What is?  A perfect example, Your

12 Honor.  If I were to take this document, which happens to be

13 the plan and disclosure statement, hand it to Motorola, hand it

14 to NCI, hand it to the noteholders, and say, "I want you to

15 vote on this.  This is the plan.  This document here is the

16 plan."

17         I get their vote.  I haven't gotten an approved

18 disclosure statement.  I haven't done anything.  I just -- this

19 is the plan.  Then I come to the Court and I say, "Your Honor,

20 we had a --" you know, then I go through the regular process.

21 I put in a motion to --

22         THE COURT:  Um-hum.

23         MR. DeFRANCESCHI:  -- prove solicitation procedures.

24         THE COURT:  Um-hum.

25         MR. DeFRANCESCHI:  I get the disclosure statement.

1 Same disclosure statement to prove this having adequate

2 information we solicited.

3       And then I come in and say, "Your Honor, we didn't

4 send ballots to these folks here. They had no way out of this.

5 We just -- before anything was approved here we told them this

6 is the plan that they're going to vote on, and we're holding

7 them to that."

8       THE COURT: Well, isn't that what the lock-up

9 agreement is?

10       MR. DeFRANCESCHI: Absolutely not, Your Honor.

11 Absolutely not.

12       THE COURT: The lock-up agreement says, "We're going

13 to hold you to it. In fact, we can get specific performance."

14       MR. DeFRANCESCHI: It says a lot more than that, Your

15 Honor, a lot more that's very important here.

16       THE COURT: Well --

17       MR. DeFRANCESCHI: And I'm going to tell you what it

18 says that's important.

19       THE COURT: Let's talk about whether it's

20 solicitation. The other things may or may not be relevant.

21       MR. DeFRANCESCHI: Well, Your Honor --

22       THE COURT: But you solicited -- post petition they

23 signed it. The fact that it says effective as of May 29th,

24 didn't they sign it post petition?

25       MR. DeFRANCESCHI: Well, as a matter of fact, Your

1 Honor --

2          THE COURT:  Motorola?

3          MR. DeFRANCESCHI:  -- they actually signed the lock-
4 up agreement, the noteholders signed it pre-petition.  They
5 just didn't have authority to release it.

6          THE COURT:  Mr. Gilker doesn't say that.

7          MR. DeFRANCESCHI:  Didn't have authority to release
8 the signatures until the post petition -- we received it --

9          THE COURT:  Well, Mr. Gilker's affidavit says there
10 were modifications to the lock-up --

11         MR. DeFRANCESCHI:  There were modifications.

12         THE COURT:  -- agreement post petition.

13         MR. DeFRANCESCHI:  Yes.

14         THE COURT:  And that that --

15         MR. DeFRANCESCHI:  What his affidavit says is there
16 were ministerial, non-material changes to the lock-up
17 agreement.

18         THE COURT:  To make it conform to the NCI, which was
19 signed --

20         MR. DeFRANCESCHI:  To make it conform.

21         THE COURT:  -- an hour before the petition.

22         MR. DeFRANCESCHI:  Yes, it was, Your Honor.  Yes, it
23 was.  What is also true here -- Your Honor asked a specific
24 question, whether it was signed.  There were signature pages.
25 The facts of the case are very important.

1      It was a Friday afternoon --

2      THE COURT:  Um-hum.

3      MR. DeFRANCESCHI:  -- just prior to the Memorial Day

4  holiday.  Counsel for the noteholders had all the signature

5  pages, had authority to release them, save one signature page.

6  They couldn't get in touch with that particular noteholder to

7  release it.  And as a result of the intervening holiday

8  weekend, basically what happened, Your Honor, is very simple.

9  Two business days later when they came back to the office they

10  gave them final authority to release the signature pages.

11      But I really do want Your Honor to understand our

12  position, and perhaps Your Honor understands it very well that

13  -- and disagrees with us that this was not an acceptance of a

14  plan and that just because --

15      THE COURT:  Well --

16      MR. DeFRANCESCHI:  -- I'm sorry.

17      THE COURT:  No, it was solicitation for an acceptance

18  of the plan.

19      MR. DeFRANCESCHI:  Your Honor, <u>Century Glove</u>

20  specifically, specifically sanctions the procedure we did here.

21  It says --

22      THE COURT:  No, it does not.

23      MR. DeFRANCESCHI:  Yes, it --

24      THE COURT:  There was not a lock-up agreement --

25      MR. DeFRANCESCHI:  Your Honor, respectfully --

1    THE COURT:  -- sent with that plan, and it wasn't

2  signed.

3    MR. DeFRANCESCHI:  Your Honor --

4    THE COURT:  The plan was sent.

5    MR. DeFRANCESCHI:  Respectfully.

6    THE COURT:  The Court said you can negotiate.

7    MR. DeFRANCESCHI:  Respectfully.

8    THE COURT:  But you got to stop.

9    MR. DeFRANCESCHI:  It said more than you can

10  negotiate.  It says you can solicit future acceptances.  Future

11  acceptances of what?  Of agreements to a plan, that was the

12  context of this particular case.

13    It was 1125(b) --

14    THE COURT:  It didn't say you can --

15    MR. DeFRANCESCHI:  -- that was being considered.

16    THE COURT:  -- sign.  It did not say you can sign a

17  lock-up agreement that binds you to vote in favor of the plan.

18    MR. DeFRANCESCHI:  Your Honor --

19    THE COURT:  That -- there's got to be a line.

20    MR. DeFRANCESCHI:  Your Honor, there is a line.

21  There is a way that this Court can harmonize the provisions of

22  1125(b) and --

23    THE COURT:  Okay.

24    MR. DeFRANCESCHI:  -- 1126 by analogy, because it's

25  similar language, but --

1        THE COURT:  Well --

2        MR. DeFRANCESCHI:  -- focusing on 1125(b) for the

3   moment.  There's a way to harmonize that provision together

4   with the Century Glove decision, which is really the only Third

5   Circuit decision that addresses this general issue of

6   solicitation under 1125 --

7        THE COURT:  How?

8        MR. DeFRANCESCHI:  Here's how you do it.  First of

9   all, if you -- if you see what the Third Circuit was looking at

10  in that case, it is just a given in this practice, in the

11  bankruptcy practice, that negotiations which would ultimately

12  reach a consensual plan of reorganization is encouraged.

13       I don't think there would be any dispute, even from

14  the United States Trustee's Office, that that's encouraged.

15       Number two, in that particular case, in the Century

16  Glove case, the Court made very clear that it sees no

17  principled distinction between creditor negotiations and

18  soliciting future acceptances of a plan, no principle

19  distinction.  It's right there in black and white.

20       Now --

21       MR. DeFRANCESCHI:  No, it talked about negotiating

22  regarding a consensual plan.  It didn't say, "soliciting future

23  acceptances, i.e., sign a ballot."

24       MR. DeFRANCESCHI:  It absolutely was giving this

25  Court guidance when it said that that section of the code must

1  be read narrowly, because if you don't read it narrowly, what's
2  going to happen? And I'm going to tell Your Honor how you
3  could very easily read it narrowly and not to apply it in this
4  case.

5  THE COURT: Well, how can it be read narrowly
6  consistent with your enforcement of these lock-up agreements?

7  MR. DeFRANCESCHI: Well, first of all Your Honor,
8  there is a major factual premise that is entirely erroneous
9  here. We've assumed that we're seeking to enforce a lock-up
10  agreement.

11  Where is there any evidence that these debtors have
12  ever sought to enforce this lock-up agreement? There is none,
13  and we are not seeking to enforce it.

14  Isn't that important? I think the answer to that
15  question is absolutely yes.

16  THE COURT: No, it would be important in the 1126
17  context, but not in the 1125. 1125 prohibits solicitation of a
18  vote. It does not prohibit enforcement of a post petition pre-
19  disclosure statement vote.

20  MR. DeFRANCESCHI: Section --

21  THE COURT: It prohibits solicitation.

22  MR. DeFRANCESCHI: Section 1125(b) prohibits -- says
23  that the acceptance or rejection of a plan may not be
24  solicited.

25  THE COURT: Right.

1    MR. DeFRANCESCHI:  That's what it says, unless you
2  follow --

3         THE COURT:  Right.

4         MR. DeFRANCESCHI:  -- you know, 11256(a) and (c) and
5  those requirements.

6         Number one, there should also be no dispute that we,
7  in fact, followed and are relying on the solicitation
8  procedures this Court approved consistent with general
9  practice, that we received the votes, and it's those votes of
10 the lock-up noteholders and MCI -- MCI and Motorola that we are
11 counting here.

12        I think we can lay that to rest.

13        THE COURT:  Right.

14        MR. DeFRANCESCHI:  That happened.  But to say that
15 because there's a specific performance provision in this
16 agreement coupled with the language in the prior paragraph of
17 the agreement somehow makes that the official vote or makes
18 that --

19        THE COURT:  Well --

20        MR. DeFRANCESCHI:  -- makes that the acceptance of
21 the plan.

22        THE COURT:  No, it doesn't.  Does it constitute the
23 solicitation of a vote that's prohibited by 1125?  The U.S.
24 Trustee is not saying this is the vote.  It's saying this was a
25 solicitation for a vote on the plan.

1    MR. DeFRANCESCHI:  It doesn't say a vote, with all
2   due respect, narrowly reading the express language --

3            THE COURT:  Accepting or rejecting.

4            MR. DeFRANCESCHI:  -- it says -- well, I --

5            THE COURT:  How is that different?

6            MR. DeFRANCESCHI:  Your Honor, I take exception to
7   that, because the Third Circuit has stated very clearly we
8   should read this section narrowly, and to say that the
9   acceptance or rejection of a plan is the same as a vote, I
10  think -- I think that misses the mark.

11           What I think it is saying here is this -- in this
12  case we did not solicit the acceptance of a plan.  What we said
13  in this case is --

14           THE COURT:  What did you solicit in the lock-up
15  agreement then?

16           MR. DeFRANCESCHI:  It's very -- we should go through
17  -- to the terms of the lock-up agreement.  I think it's
18  instructive if we do that rather than dance around the issue as
19  I know the United States Trustee would have us do.  We've
20  attached copies of the lock-up agreements to the affidavit.

21           THE COURT:  I have it.

22           MR. DeFRANCESCHI:  And I think that there are
23  significant provisions in here that make very clear -- and I
24  should add, Your Honor -- I know I'm stepping away from the
25  podium, but I think it's picking it up.

1      I should add, Your Honor, and this is another
2 predicate piece of information I think is very important here,
3 these agreements were negotiated by parties who -- and I think
4 this is very important -- very sophisticated business people,
5 very sophisticated legal and financial advisers.

6      What that means, of necessity, Your Honor, is that
7 when they draft an agreement like this they mean what they're
8 saying.  It's not a situation where we just put these wink and
9 a not provisions in this agreement.  This is a situation where
10 the parties, sophisticated parties at arm's length with the
11 life of this company on the line, negotiated an agreement.

12      So, what does the agreement say?  We provide
13 provisions of the agreement, we outline them in our -- in our
14 papers.

15      We outline them in our papers, and I think among the
16 provisions you need to consider -- and if the Court will
17 indulge me, I do -- this is very important and I do want to
18 rely on my outline for the hearing.  I usually don't do that,
19 but it's very important.  I want to make the points.

20      First, Your Honor, the agreement to vote all of the
21 claims in favor of the plan, which is in Paragraph 3, were
22 expressly conditions on, again, the terms of the plan and the
23 restructuring documents.

24      By the way, Your Honor, so the Court's aware, these
25 are the restructuring documents.

1      THE COURT:  Um-hum.

2      MR. DeFRANCESCHI:  These were not done.  These are
3  the restructuring documents.  Keep that in mind as I continue.

4      Expressly conditioned on the terms of the plan and
5  the restructuring documents being consistent with and no less
6  favorable to the lock-up party than the terms set forth in the
7  term sheet and the terms and conditions of the plan in all
8  respects not specifically addressed by the term sheet are
9  acceptable to each lock-up party in its sole and exclusive
10  discretion.

11      When the parties drafted that they meant what the
12  said, in their sole and exclusive discretion.  There's no
13  evidence nor could there be, 'cause it's not the case, that the
14  term sheet comprised all the terms in this plan that we're
15  seeking confirmation of today.  Out number one.

16      Number two, Your Honor.  The lock-up agreements
17  expressly provided that nothing in the lock-up agreements, and
18  this is in Paragraph 5 or Section 5, shall require the debtors,
19  my client, to breach its fiduciary duties as a Chapter 11
20  debtor in possession and exercise -- and any exercise of such
21  fiduciary duties by the debtor shall not be deemed to
22  constitute a breach of the terms of this agreement.

23      By its own terms -- this is important, Your Honor --
24  and the agreement of these parties the debtors did not have to
25  prepare, finalize, propose, solicit, seek confirmation of or

1 even go effective on a plan if to do so would violate my
2 client's fiduciary duties.

3         Certainly this is consistent with our duties as a
4 Chapter 11 debtor in possession.

5         It bears mentioning on this point, Your Honor, that
6 the debtors considered numerous other financial restructuring
7 possibilities.  We've outlined them before for the Court, and
8 they're in our affidavits, but suffice it to say we determined
9 in the exercise of those duties that this plan that we're
10 seeking confirmation of is the best plan for these estates.

11         Moreover, Your Honor, the creditors committee
12 represented by legal counsel and financial advisers spent
13 considerable time and effort trying to come up with another
14 plan.  They couldn't do that, either, Your Honor.

15         This is the plan.

16         Next point, Your Honor.  The agreement expressly
17 stated that the lock-up parties could, quote, "terminate the
18 obligations under the agreement and rescind any vote on the
19 plan which vote shall be null and void and have no further
20 force and effect upon the occurrence of certain events,
21 including --" and I'll get into those in a minute, Your Honor,
22 but the very fact that it said, "if the agreement isn't
23 followed they can rescind any vote on the plan, it'll be null
24 and void," suggests that there was no vote on this plan at the
25 time the agreement was entered into.

1       That's -- how can they get out of the agreement?
2  Okay.

3       If the restructuring documents, Your Honor -- that's
4  these documents right here, several hundred pages of
5  sophisticated contractual and legal documents.  If they are
6  inconsistent with the term sheet, unless those documents are
7  consented to, something in the future that yet has to happen,
8  lock-up parties can terminate.

9       If the debtors breach the agreement, lock-up parties
10 can terminate.

11      If other parties to the lock-up -- other lock-up
12 agreements breach their agreements or have not entered into
13 lock-up agreements, can terminate.

14      Significantly -- and I don't think this issue has
15 come up before this Court to my knowledge, the provision also
16 allowed for termination -- this is 8H -- if there was any
17 material adverse change with respect to the debtor, its assets,
18 its liabilities or operations, the Chapter 11 proceedings or
19 the ability of the debtor to confirm the plan on a consensual
20 basis.

21      For the United States Trustee's Office to suggest
22 that that isn't a huge potential out for these parties -- if,
23 for example, the disclosure statement wasn't to their liking,
24 if the plan wasn't to their liking, if the debtor's business
25 changed to some significant degree such that the mac (phonetic)

1 clause came into effect, I don't know what is. But there's
2 more.

3          THE COURT: Well, it doesn't say if it's not to their
4 liking.

5          MR. DeFRANCESCHI: Well, Your Honor, with --

6          THE COURT: If it's consistent with the term sheet --

7          MR. DeFRANCESCHI: They're -- I've already given you
8 --

9          THE COURT: -- they're bound.

10          MR. DeFRANCESCHI: -- I've already given you the
11 provision. It says that they have sole and exclusive
12 discretion with respect to any provision of the plan that --
13 and that's in Paragraph --

14          THE COURT: I see. I see it.

15          MR. DeFRANCESCHI: Yeah, okay.

16          Each of these provisions demonstrate that the lock-u
17 parties had not definitively accepted a plan. Rather there was
18 an agreement to vote in favor of a plan in the future, subject
19 to these substantial conditions.

20          But there is more in the agreement that compels this
21 reading, Your Honor. The lock-ups provide, quote, "The
22 agreement is not and shall not be deemed to be a solicitation
23 for consents to a plan. The acceptances of the lock-up party
24 --" I paraphrased -- will not be solicited until such parties
25 have received a disclosure statement and related ballot as

1 approved by the Bankruptcy Court. It's Paragraph 7.

2           The United States Trustee, Your Honor, would ask the

3 Court to ignore the provision arguing that the U.S. Trustee

4 knows better what the parties actually agreed to, suggesting

5 that this is somehow a sort of wink and a nod provision.

6           THE COURT: Well, you can't call something --

7           MR. DeFRANCESCHI: Your Honor, this --

8           THE COURT: -- black if it's white.

9           MR. DeFRANCESCHI: We're not doing that, Your Honor.

10 There is a reason for this provision.

11           THE COURT: Okay.

12           MR. DeFRANCESCHI: There is a very significant reason

13 why the sophisticated parties to this agreement wanted that in

14 there.

15           THE COURT: Other than to avoid Section 1125.

16           MR. DeFRANCESCHI: Well, Your Honor, phrasing it that

17 way suggests that there was something untoward here, and I

18 suggest there's not.

19           But here's the reason. That provision is in there to

20 protect against the very thing, the very thing that the debtors

21 tried to do with the bondholders in the Pioneer case.

22 Remember, in the Pioneer case there was a pre-petition exchange

23 offer, and as part of the exchange offer there was a box where

24 they could check off that said if the exchange doesn't have

25 unanimous consent, then you're -- pre-petition, if there wasn't

1 unanimous consent, then you will consent to vote in favor of a
2 plan on substantially similar terms of the exchange offer, a
3 copy of which was provided.

4          The debtors tried to use that pre-petition consent --
5          THE COURT:   Um-hum.

6          MR. DeFRANCESCHI:   -- from some seventy-some odd
7 percent of the bondholders post petition as a vote on a plan to
8 satisfy the various confirmation requirements.  The Court said
9 no.  No.

10          What the parties in this case did was, is they
11 precluded the debtors from trying to do that.  And in fact the
12 debtors have not done that.  We have not -- we have not taken
13 the lock-up agreements and said to Your Honor, "This agreement
14 right here?  This is the vote."  And the parties contractually
15 protected themselves with that provision.  It's not a wink and
16 a nod provision.  It's an important provision.  It's there for
17 a reason.

18          Your Honor, on this point we think that in light of
19 the facts of this case, which may or may not be the same.  The
20 United States Trustee makes suggestions that in some of these
21 cases there may or may not have been a specific performance
22 provision.  There may or may not have been these other
23 provisions, the mac clause, the clause -- the provision that
24 the parties bargained for that said if the plan is different
25 from the expressed terms of the term sheet they have their

1 absolute and exclusive discretion to get out of the deal.
2 Under the facts of this case --

3         THE COURT:  Now, you're going too far in your
4 absolute discretion to get out of the deal.  It's only if --

5         MR. DeFRANCESCHI:  As I said, if the plan has
6 provisions beyond what's in the terms sheet, which it most
7 certainly does, then the language -- I'll read it for Your
8 Honor again.

9         It says they have absolute and exclusive discretion.

10         THE COURT:  No, it says if they're inconsistent.

11         MR. DeFRANCESCHI:  Exactly.  Well --

12         THE COURT:  Not beyond.  I mea, the fact that there's
13 --

14         MR. DeFRANCESCHI:  -- presumably --

15         THE COURT:  The fact that the plan contains a
16 definitional section which is not contained in the term sheet,
17 I would submit, you would not concede means that the parties to
18 the lock-up agreement are not bound to vote in favor of the
19 plan.

20         MR. DeFRANCESCHI:  Your Honor, we're not here to
21 decide that issue, because no one has suggested one way or the
22 other on that.

23         The provision says what it says.

24         THE COURT:  Um-hum.

25         MR. DeFRANCESCHI:  The argument here, remember, is

1 that we -- that there was an acceptance of plan that was
2 solicited by these documents.

3          THE COURT:   Yes.

4          MR. DeFRANCESCHI:   That's what the code requires in
5 order for that section to apply.

6          THE COURT:   Um-hum.

7          MR. DeFRANCESCHI:   There -- these provisions make
8 very clear, and Your Honor, we must look at the entire
9 agreement.   These provisions make very clear that there was not
10 an acceptance of a plan that was solicited.   There couldn't
11 have been.

12          There couldn't have been.   There were too many outs
13 in this agreement, and these -- again, Your Honor, I have to
14 emphasize.

15          MR. KRELLER:   Your Honor, Thomas Kreller of Millbank,
16 Tweed, Hadley and McCoy (phonetic) on behalf of the Ad Hoc
17 Bondholder group.   I apologize for interrupting Mr.
18 DeFranceschi, and I'll cede the podium back to him.

19          Just on this point, Your Honor, I would like to
20 advise you that from the bondholder perspective, and we are the
21 counsel who represented the bondholder group in negotiating the
22 plan support agreement, in negotiating the term sheet that
23 underlied that plan support agreement and in negotiating
24 ultimately these restructuring documents and the plan itself,
25 the bondholder group believed in fact that by virtue of the

1 lock-up agreement and the various provisions that gave us
2 discretion, we believed and we asserted throughout that we had
3 very broad discretion to terminate our obligations under the
4 plan support agreement.

5 We believe that we agreed to proceed towards an
6 attempt to consummation of the -- to consummate the transaction
7 that was outlined in the term sheet, but it was always subject
8 to our discretion and our approval of all of the various
9 restructuring documents.

10 Your Honor, I can also tell you that on a number of
11 occasions over the course of the case, and in the context of
12 negotiating some of the restructuring documents, some of the
13 terms of the plan and some issues that came up during the
14 course of the approval of the disclosure statement and the
15 solicitation of votes, we advised the company that we believed
16 we had the right to terminate the plan support agreements
17 because of things that had happened or because of drafts of
18 documents that were circulated, and that if those issues
19 weren't cleared up in a way satisfactory to us that in fact we
20 would very seriously consider terminating the plan support
21 agreements.

22 Your Honor, I -- just one example. We insisted with
23 the company that there be additional disclosure when the
24 company filed its 10Q. We insisted that that go out to
25 creditors as part of the voting process, and the company

1 concurred with that, and we did so. But had that not happened,
2 I guarantee you that the bondholders would have seriously
3 considered terminating the support agreement.

4 And I can tell you, trust me, that if the bondholders
5 didn't want to vote for this -- yes for this plan, they
6 wouldn't have voted because they thought they could be
7 compelled to under the support agreement. And we would be here
8 having a very different discussion about whether this agreement
9 is enforceable or not.

10 That's not the discussion for today. We -- no one's
11 attempting to enforce the agreement. In fact, the agreement's
12 probably lapsed by its terms several weeks ago. And so, Your
13 Honor, just on that particular point, just so you know the
14 bondholders' perspective, and presumably the bondholders who
15 signed support agreements are the purported victims of this
16 improper solicitation. I think our opinion is relevant. We
17 did not believe that we were obligated to vote on any
18 particular plan until this plan came out, under the underlying
19 restructuring documents were done to our satisfaction.

20 And at the time our votes were cast, that's what our
21 votes were cast on, not based on a term sheet or not based on
22 the existence of the plan support agreement, Your Honor.

23 And I'll -- would like some time to address some of
24 our other issues later, but I did want to weigh in on that
25 particular point.

1    MR. DeFRANCESCHI:  Your Honor, apologize for getting
2 a little too animated here, but this is a very important issue.
3    THE COURT:  Um-hum.

4    MR. DeFRANCESCHI:  Very important issue, and I think,
5 putting aside whether I personally, as a member of the Delaware
6 bar, agree with the policy decision made by the United States
7 Trustee, it's irrelevant.

8    What is relevant here though is the facts and
9 circumstances presented to Your Honor today.  And based on
10 those facts and circumstances and the direction from the Third
11 Circuit to narrowly read this section, because we want to
12 encourage negotiations, and the fact that the only document
13 that was attached to the lock-up agreement was the term sheet
14 which admittedly was a pre-petition agreement.  There's no
15 dispute on that.  It was done May 21st.  Compels a decision
16 that there was no acceptance -- or obviously rejection -- but
17 no acceptance of a plan that was solicited here.

18    Your Honor, I could -- I could continue with the rest
19 of my arguments, but I do think that on this point I don't know
20 if Mr. Kreller or the other parties want to weigh in on it.  I
21 do think that this is the threshold issue.  I think it's the
22 significant issue.  I think it's -- I think here, under the
23 facts of this case, it is -- it is the critical issue, it is
24 the turning issue.

25    And I don't know how Your Honor wishes me to proceed.

1          THE COURT:    All right, let me hear from any other
2   party.

3          MR. HARNER:    Good afternoon, Your Honor, Paul Harner
4   of Jones, Day, Reavis and Pogue in Chicago on behalf of Nextel
5   Communications.

6          We field a joinder in the debtor's objection, and
7   obviously we join in the arguments that Mr. DeFranceschi's made
8   this afternoon, but it strikes me that there's a very important
9   distinction here that has not yet been drawn, and that is that
10  Section 1125(b) speaks to the improper post petition
11  solicitation of acceptances of a plan.

12          Your Honor, I believe, focused on that issue
13  immediately by asking a question during Mr. McMahon's argument,
14  and that was, do you now concede that my client, Nextel
15  Communications, Inc., in fact signed its lock-up agreement
16  prior to the petition date, and he agreed that we had signed
17  the agreement at that time, concededly only an hour before, but
18  during the pre-petition period.

19          I think what that also suggests is that we would not
20  even be having this discussion if these agreements had all been
21  signed, say an hour before the petition date, or a minute
22  before the petitions were filed in this court, much less a day
23  or a week or a month.

24          What that suggests is that the important distinction
25  here is whether or not the solicitation is this document

1  itself.  If there was a solicitation here, and there may very
2  well have been, it was a solicitation to agree, as the parties
3  ultimately did in these documents, as a contractual matter to
4  support a plan under certain circumstances.  And Mr.
5  DeFranceschi's reviewed for you at great length what the
6  exceptions to those circumstances were, what the parties outs
7  were, and as Mr. Kreller just pointed out, these agreements
8  have now expired by their terms, pursuant to a temporal
9  termination clause.

10          But what's relevant about all of this is that if
11  there was a solicitation, it was only for that contractual
12  agreement, and that solicitation by definition must have
13  occurred during the pre-petition period, whether these
14  agreements were signed or as is more technically correct, the
15  signatures were released from escrow a day, a business day or
16  two business days subsequent to the filing of the petition.

17          There was months of negotiations that occurred prior
18  to the petition date, active, good faith, arm's length,
19  extensive, sometimes vigorous and contentious negotiations
20  between highly sophisticated parties that led to this
21  agreement.

22          This agreement to support a certain plan under
23  certain contractual circumstances subject to certain outs had
24  been reached before the petition was filed here.  And the fact
25  that the signatures were executed or released from escrow

1  subsequent to the petition date is irrelevant. What Section
2  1125(b) speaks to is the improper post petition solicitation of
3  acceptances of a plan.

4         This document, these documents, these lock-up
5  agreements, are not themselves the solicitation activity that's
6  at issue here. The solicitation activity were those
7  discussions that occurred beforehand. Now, that leads me --

8         THE COURT: Well, but you can't say the first time I
9  talked to you about the plan was the solicitation but the last
10 time I did, and you actually signed something that bound you to
11 the plan was not a solicitation.

12        MR. HARNER: I don't disagree, Your Honor, and it
13 requires a case by case determination, but that leads to a
14 suggestion Nextel would posit with respect to how in a
15 principled way the Court can resolve this, exercising its own
16 discretion to examine these cases on an individual case-
17 specific basis.

18        THE COURT: Um-hum.

19        MR. HARNER: We're on very dangerous ground here, and
20 I'm not going to presume to question the U.S. Trustee's policy
21 judgment with respect to these matters, either, but it's become
22 abundantly clear that the United States Trustee has generally
23 become hostile to lock-up agreements.

24        THE COURT: Post petition lock-up agreements.

25        MR. HARNER: Post petition lock-up agreements, that's

1 correct --

2 THE COURT: Uh-huh.

3 MR. HARNER: -- and that obviously was an issue in
4 this case early on, when we talked about the proper composition
5 of the unsecured creditors committee.

6 But the fact of the matter is that these agreements
7 are a very, very common practice, and they save people a lot of
8 time and a lot of money, and the bankruptcy process that we've
9 all gotten used to -- by the way, Mr. McMahon kept talking
10 about pre-package cases. This isn't a pre-packaged plan of
11 reorganization. It was never intended to be.

12 What the parties were always trying to achieve here
13 was a pre-negotiated plan of reorganization.

14 THE COURT: Um-hum.

15 MR. HARNER: What they tried to do is what prudent
16 business people try to do in exactly these circumstances, which
17 is stay out of bankruptcy court as long as possible so that
18 both the system and the parties' resources are not burdened
19 until they can reach an agreement, if that's possible. That's
20 exactly what happened here.

21 If we adopt the U.S. Trustee's approach we're going
22 to discourage that kind of approach in future cases. And it
23 seems to me the way to reconcile that or avoid that result --

24 THE COURT: How are we going to -- how are we going
25 to discourage that? We're going to say pre-petition you can do

1 what you want.

2 MR. HARNER: Well, that --

3 THE COURT: But post petition you do have to follow
4 the rules.

5 MR. HARNER: And it strikes me that it's not at all
6 inconsistent with the rules if a signature gets released
7 afterwards, but the agreement's made -- and more importantly,
8 and this is the point I was making earlier, Your Honor, the
9 solicitation, to the extent that you characterize any of these
10 activities as solicitation, is done pre-petition.

11 So, here's the principled way to reconcile the
12 problem. The Court, on a case by case basis, in this or any
13 other similar or dissimilar case, can make a determination
14 whether on the facts -- and you have those facts before you by
15 affidavit and otherwise -- there were, in fact, solicitation
16 activities occurring post petition or whether or not, as Mr.
17 Gilker's affidavit points out, what was going on here was post
18 petition ministerial activities.

19 THE COURT: Um-hum.

20 MR. HARNER: The solicitation activities here you
21 absolutely, in our view, have the discretion to find occurred,
22 to the extent that any did, in the pre petition period here.
23 If there's ever a case for the Court to exercise that
24 discretion and not designate votes based on this highly
25 technical reading of what occurred here, this is the one. We

1 urge you to exercise that discretion and to adopt a rule that
2 allows you to make that determination on a case by cases basis
3 of when solicitation activities occurred for selection --
4 Section 1125(b) purposes in this case.

5 Thank you, Your Honor.

6 THE COURT: Thank you.

7 MR. KRELLER: Your Honor, Thomas Kreller again on
8 behalf of the Ad Hoc Bondholder group. I'll be brief. I'll
9 reiterate Mr. Harner's statements regarding the timing of the
10 execution of the lock-up agreements, Your Honor.

11 The term sheet was in place well before the filing of
12 the bankruptcy case. The lock-up agreements were substantially
13 final, and in fact signed by NCI prior to the filing of the
14 case.

15 What occurred in the post petition period were minor
16 revisions to the plan support agreement to conform the forms of
17 agreement to reflect the fact that we had three parties with
18 very different interests who were attempting to move forward on
19 a consensual basis, I think a very productive effort on their
20 part.

21 There were no activities with respect to the
22 solicitation of the terms of the term sheet, which is the only
23 thing at this point that could be viewed as the plan, since the
24 plan didn't exist at the time of the lock-up agreements.

25 The term sheet simply did not move during the time

1 period that -- to the extent anyone's concerned about a time
2 period.

3          There are a couple of other basic points, basic
4 facts.  I -- what the U.S. Trustee appears to be concerned
5 about is the ability of a debtor to compel a creditor to accept
6 a plan over that creditor's subsequent objection.

7          I missed --

8          THE COURT:  No, not necessarily, and we're missing
9 the insidious effect of having signed a lock-up agreement,
10 whether the creditor felt compelled to vote in favor of the
11 plan to avoid litigation over whether or not, you know, this
12 out would be applicable or not.

13          I mean, I don't think I have to decide this issue.
14 Only in the event that your clients feel you were misled or
15 want to get out of the lock-up agreement.

16          MR. KRELLER:  I'm not suggesting that you do, Your
17 Honor.  Number one, I am missing any insidious effect of
18 anything here, quite frankly.  But I -- what I -- what this
19 goes to, Your Honor, is the policy behind what's being asserted
20 here, and there -- you can't make the -- if a debtor was able
21 to enforce a lock- up agreement pursuant to a specific
22 performance clause, it would be you, Your Honor, who would have
23 to enforce that lock-up and order specific performance.

24          THE COURT:  Um-hum.

25          MR. KRELLER:  Under what circumstances would you

1 compel specific performance of a lock-up agreement if you found

2 that lock-up agreement, which you would have to in order to

3 find specific performance, if you found that lock-up agreement

4 was tantamount to an improper solicitation?

5 If the creditor was bound to vote for the plan under

6 the terms of the lock-up --

7 THE COURT: Um-hum.

8 MR. KRELLER: -- and you were put in a position of

9 being asked to enforce that lock-up -- if there was an improper

10 solicitation you simply wouldn't order specific performance on

11 that lock-up agreement, would you?

12 THE COURT: Course not. But I don't know, again,

13 what the effect of the lock-up agreement is where your clients

14 have not asked me to let them out of it.

15 The fact that it was signed had some effect.

16 MR. KRELLER: Your Honor, the fact that it --

17 THE COURT: Or it would not have been signed or the

18 debtor would not have asked you to sign it.

19 MR. KRELLER: The effect of signing the lock-up

20 agreement was that we knew, NCI knew, Motorola knew, and the

21 debtor knew that we were all proceeding forward --

22 THE COURT: Um-hum.

23 MR. KRELLER: -- in lockstep manner on a consensual

24 basis. That was the effect of the signing. We've been through

25 this, and I won't belabor it, we had plenty of discretion. Did

1 we have absolute discretion to terminate these agreements? I
2 don't say we had absolute discretion. We had plenty of
3 discretion. In a situation where we had plenty of discretion,
4 what does specific performance mean? How vulnerable are we to
5 a specific performance argument? I don't think very.

6 And again, Your Honor, to get back to it, if the fear
7 is the creditors are somehow disadvantaged here or taken
8 advantage of by a debtor, whether through threats of litigation
9 and a creditor believing it was going to somehow avoid
10 litigation and the associated costs, whatever the fear is, you
11 wouldn't find yourself in a situation where you were ordering
12 specific performance under a lock-up agreement like this,
13 unless you were prepared to order specific performance and then
14 turn around and designate the vote and have the whole thing be
15 moot.

16 THE COURT: Well, that may, in fact, be exactly what
17 the result is.

18 MR. KRELLER: Well, Your Honor --

19 THE COURT: The -- 1125 doesn't deal with whether or
20 not, you know, a contract between you and the debtor to vote in
21 favor of a plan is enforceable or not.

22 MR. KRELLER: I agree, Your Honor.

23 THE COURT: The may -- you may be subject to other
24 damages by the debtor for your failure to comply with the
25 agreement.

1          MR. KRELLER:  That's -- that may well be, Your Honor.
2   And I agree, but if the fear behind this is somehow the
3   compulsion of creditors through a solicitation on less than
4   adequate information, which is certainly not the case here, and
5   I'm sure Mr. DeFranceschi will take you through that, and I'm
6   happy to as well.  That simply is not the case and could almost
7   never be the case, quite frankly, under these circumstances,
8   Your Honor.

9          And I guess the last point, Your Honor, that I would
10  raise is the -- even if you conclude that there was an improper
11  solicitation, and even if you conclude that somehow my clients
12  were bound to this agreement and voted for the plan as a result
13  of signing this lock-up agreement, which I don't concede, and I
14  wouldn't believe would be the appropriate ruling, the question
15  then turns to what is the appropriate remedy?

16         There's been no wrongdoing here, Your Honor.  There's
17  been the intervention of a holiday weekend at the very tail end
18  of what was a very difficult and hard-fought process.  And a
19  decision by a debtor that it, as a business matter, wanted to
20  have a long holiday weekend in Latin America to approach people
21  and deal with vendor issues and other matters critical to the
22  business, and that the filing of the case, knowing that things
23  had progressed to term sheet stage, and in fact to lock-up
24  agreement stage, gave them the comfort that they could make
25  that filing, do what they needed to do on the business side and

1 collect signatures later.

2 There's no wrongdoing here, Your Honor. There's no
3 evidence of that, nor do I know that there's any suggestion,
4 quite frankly, and nothing in the record would support that.

5 And the question then turns to remedy. And
6 designation, Your Honor, is a rather dramatic remedy here. An
7 appropriate remedy in the face of such a ruling might be to
8 allow creditors who were locked up to the agreements the
9 opportunity to change their votes, if they so decided to do.

10 We -- had we thought that was appropriate, my clients
11 would have already done so. And I can tell you that my clients
12 do not wish to change their votes, and at no point in this
13 process had any intention of changing their votes once cast and
14 once these documents were done.

15 And so, Your Honor, I think -- even if we get to the
16 point where you've concluded on these other issues and you're
17 looking to the designation as a remedy, I would suggest that
18 that remedy is inappropriate here, particularly under these
19 facts and circumstances, and that, you know, to the extent
20 there is a remedy needed, it would be to reach out to the
21 creditors who were parties to these support agreements, and I
22 believe you probably have at least their counsel and perhaps
23 representatives of all of them here and available to you at
24 some level, or we could make that happen.

25 To the extent you would like to implement that

1 remedy, that would seem to me to be much more appropriate than
2 designation as a result of some of these other issues that
3 we've raised.

4 THE COURT: Well, the debtor has asserted that
5 designation makes no difference, confirmation.

6 MR. KRELLER: Your Honor, I believe the debtor has
7 submitted, and the ad hoc group would concur, that if you were
8 to designate the votes, the requisite acceptances by far would
9 still have come in under Class 6.

10 And if by meaning it has no effect on confirmation,
11 you mean the plan is still confirmable and should be confirmed,
12 I would agree with that. Whether it has no effect, Your Honor,
13 I -- as professionals who deal in these kinds of cases every
14 day, Your Honor, these lock-up agreements are very important to
15 the process and --

16 THE COURT: Yeah, but not post petition.

17 MR. KRELLER: Your Honor, the activities that -- Your
18 Honor, we -- I guess we -- I won't go down that path, because
19 we don't need to debate how one gets to a consensual plan
20 without talking to people about what it is they propose to do.

21 THE COURT: There's nothing wrong with the talking,
22 and Century Glove said that, but there's a big difference
23 between talking and signing a contract such a lock-up
24 agreement.

25 MR. KRELLER: Well, Your Honor, I would just -- I

1 would submit then that the signing of a lock-up with a specific
2 performance clause which seems to be creating some problems, a
3 specific performance clause of questionable enforceability, I
4 think, is well within the bounds. But nonetheless, Your Honor,
5 you have my points. And I'll rest.

6          THE COURT: I do.

7          MR. DeFRANCESCHI: Your Honor, I too might concede
8 that in certain situations, in lock-up agreements, unlike the
9 one before Your Honor, there may be something wrong with that.
10 I will -- I would not concede that there was anything improper
11 here with this lock-up agreement.

12          Your Honor had raised a couple questions about
13 whether designation matters here or not. And I believe we
14 would have the evidence to show that Class 6 would carry even
15 without these votes, and it would be an overwhelming support
16 for the plan.

17          But beyond that, Classes 2 and 3 had one party in
18 each class which was Motorola entities. And the anomaly here,
19 Your Honor, is that they full support the treatment that
20 they're getting under the plan and actually voted in favor of
21 the plan. If you were to designate and determine that their
22 votes don't count and then come to the conclusion that those
23 two classes have rejected, I would submit that we certainly
24 have the case for a consensual cram-down on those two classes.

25          THE COURT: Um-hum.

1    MR. DeFRANCESCHI:  I mean, they're here and they
2 consent to the treatment, so, in some respect it doesn't
3 matter, but in another respect, Your Honor, it really matter,
4 because -- and I don't want to go on forever on this point, but
5 the parties that are here today, and word will certainly
6 spread, need to have guidance as to what they can do in
7 connection with agreements.

8    You want to -- if you want to -- this is a lock-up
9 agreement, but it's sort of -- to say that it's a lock-up
10 agreement does not -- does not mean there's anything wrong with
11 that.  I mean, we could have called this the NII agreement.
12 And the fact of the matter is we need to be bound by what it
13 says, because the parties specifically negotiated protections
14 in it to allow them the ability to vote in the future in favor
15 of the plan or not vote in favor of the plan or get out of this
16 agreement if a whole series of complex actions didn't occur.

17    I'm sorry, Your Honor -- okay.  I don't know if Your
18 Honor wants me to go forward with -- I really didn't get into
19 the 1125(b) issue, because it was my view that that
20 solicitation issue doesn't get raised until we make a
21 determination if this document was the acceptance -- was the
22 post petition acceptance of a plan, because the section
23 requires a finding that that is the case, and that's what my
24 arguments have gone to so far.  Others have sort of argued
25 additional points.

1       But if we were to go to whether there was a post
2   petition solicitation of this agreement, assuming it is an
3   acceptance of plan, which as I said we disagree with, we would
4   echo the thoughts that Mr. Harner raised, that there was no
5   post petition solicitation of this document.

6       The solicitation, to the extent there was, which was
7   a solicitation seeking future acceptances of a plan, occurred
8   pre-petition.  That's what the evidence actually says, save one
9   fact, the fact that some of these agreements were dated the
10  29th of May.

11      But other than that, there is no fact that supports a
12  finding that there was a post petition solicitation, putting
13  aside again whether there was an acceptance of a plan that was
14  solicited and --

15      THE COURT:  Well --

16      MR. DeFRANCESCHI:  -- we spent a long time on that
17  issue, Your Honor.

18      THE COURT:  -- even Mr. Gilker acknowledges that
19  there were discussions post petition and there were changes,
20  and must I not conclude that somebody asked them to sign it?

21      MR. DeFRANCESCHI:  Well, as we said, there --

22      THE COURT:  It was already signed.  Somebody asked
23  them to release the signatures.

24      MR. DeFRANCESCHI:  Yeah, I think that the types of
25  changes, Your Honor, they were referred to as ministerial

1  changes, and the point was argued that they weren't changes
2  that said, you know, "You're going to vote for this plan."
3  They were -- for example, NCI did the first lock-up agreement,
4  and we needed to conform the lock-up agreements to rep -- to
5  reference that, for example, the Motorola entities had three
6  separate lock-up agreements.  They needed to be conformed to
7  provide for those three separate entities.

8      They're all slightly different in who they refer to.
9  The noteholder lock-up agreement provides provisions in it for
10 the ad hock committee and the backstopping noteholders.  Those
11 types of changes certainly -- certainly don't give rise to the
12 level of a solicitation of an acceptance of a plan.  What those
13 are, those are just basically what we would call conforming
14 changes so that the lock-up agreements -- and again, I just --
15 the agreements were consistent.

16     THE COURT:  Well, the ministerial changes may have
17 been -- the changes may have been ministerial, but --

18     MR. DeFRANCESCHI:  And since the changes were
19 ministerial, and all that counsel was waiting for was final
20 authority to release the signatures --

21     THE COURT:  Can't you see --

22     MR. DeFRANCESCHI:  I'm sorry.

23     THE COURT:  Can't you see the danger in that?  We all
24 work out a pre-petition deal.  The petition's filed, and I
25 don't ask you to hand me the signature page until the minute

1 after bankruptcy. Then I've just avoided any scrutiny of the
2 lock-up agreement, because I didn't solicit it post petition.
3 So, therefore, it comes in, and you're bound by it, but I don't
4 have to go through really complying with the disclosure
5 statement or any of the 1125 issues.

6 MR. DeFRANCESCHI: Your Honor, a couple points on
7 that. I mean, I see where you're going, I think, but it sort
8 of has as a premise that if there was some need to scrutinize
9 these agreements under this section of the code, which I -- my
10 position, based on the language, the express language of the
11 document, it's not an acceptance of a plan.

12 THE COURT: Well, I disagree with you on that point.
13 MR. DeFRANCESCHI: Your Honor --

14 THE COURT: The solicitation of an acceptance.

15 MR. DeFRANCESCHI: Your Honor has ruled on it. That
16 -- but the point though in terms of whether there's any need to
17 scrutinize it, certainly Your Honor can always scrutinize this
18 if someone raises the issue, party in interest raises the
19 issue, but it's where should that scrutiny be focused? Should
20 it be focused on a narrow interpretation of the section that
21 says that there must be a solicita -- that the acceptance or
22 rejection of a plan was solicited post petition?

23 And obviously the answer to that is yes. And then
24 Your Honor -- what Your Honor has to do is look at these facts
25 and say, because there were ministerial edits made and because

1 the signature pages weren't released, it was a post petition

2 solicitation, despite the fact that there's no evidence that we

3 asked them to do anything other than make those ministerial

4 changes post petition.

5          THE COURT:  And deliver the signatures.

6          MR. DeFRANCESCHI:  I don't know that there was really

7 any evidence to that effect, either.  I mean, the signatures

8 were forthcoming once the ministerial changes were made.  But

9 the other -- so the next step, Your Honor is --

10          THE COURT:  Well, if you didn't think --

11          MR. DeFRANCESCHI:  -- even if --

12          THE COURT:  -- if you didn't think you were going to

13 get the signatures, you wouldn't even have told them what the

14 changes were.

15          MR. DeFRANCESCHI:  We knew the signatures were

16 coming.  That was the point.

17          THE COURT:  Right.

18          MR. DeFRANCESCHI:  They had agreed to do that prior

19 to filing the case.  We knew the signatures were coming.  But

20 what's the next step?  Is the next case when there are no

21 ministerial changes at all, and the agreement --

22          THE COURT:  Right.

23          MR. DeFRANCESCHI:  -- the agreement got caught up in

24 the mail?  Now, all of a sudden that somehow is a solicitation?

25          THE COURT:  Um-hum.

1           MR. DeFRANCESCHI: I know that case isn't before the

2 Court, but that is going down the very slippery slope that --

3           THE COURT: That's what I'm saying.

4           MR. DeFRANCESCHI: That's going down a very slippery

5 slope that the Third Circuit said we shouldn't go down, the way

6 I read Century Glove. And you know, there's another important

7 point that I think needs to be brought out here. Because in

8 this case -- this case takes on added significance, because in

9 this case at the end of the day if Your Honor decides to

10 exercise her discretion to designate these entities and not

11 count the votes, we'll still have a sufficient number and

12 amount and claim. There won't be an appeal here.

13           THE COURT: Um-hum.

14           MR. DeFRANCESCHI: And so the state of flux is

15 parties still don't really know what to do in this situation,

16 'cause --

17           THE COURT: Don't use lock-ups post petition.

18           MR. DeFRANCESCHI: Well, again --

19           THE COURT: It's as simple as that.

20           MR. DeFRANCESCHI: Again --

21           THE COURT: And if you want a lock-up agreement to be

22 effective, you make darn sure you get the signature before you

23 file the petition.

24           MR. DeFRANCESCHI: With all due respect, Your Honor,

25 I -- I don't know that that really answers the question,

1 because I think that what that is doing is sort of imposing

2 some sort of a -- perhaps it's a policy argument.

3       THE COURT: There is a policy in the bankruptcy code,

4 and that is contained in 1125.

5       MR. DeFRANCESCHI: Absolutely.

6       THE COURT: You don't vote until there's disclosure

7 in accordance with the code and the Court has approved that

8 disclosure.

9       MR. DeFRANCESCHI: Right.

10       THE COURT: The Court is not involved in pre-petition

11 negotiations towards a plan.

12       MR. DeFRANCESCHI: That's right.

13       THE COURT: So, I have no jurisdiction over pre-

14 petition lock-up agreements unless you're seeking to have them

15 designated a vote.

16       MR. DeFRANCESCHI: Which we're not.

17       THE COURT: So -- but I do have --

18       MR. DeFRANCESCHI: But --

19       THE COURT: -- jurisdiction over post petition

20 activities.

21       MR. DeFRANCESCHI: I think I understand where Your

22 Honor's coming out on this, and --

23       THE COURT: Well, let me make it clear then.

24       MR. DeFRANCESCHI: Yeah.

25       THE COURT: There is no room for a post petition

1   disclosure statement.

2   MR. DeFRANCESCHI: I'm sorry, Your Honor, a post
3   petition --

4   THE COURT: Excuse me, post petition lock-up
5   agreement, thank you. And I think I must designate the votes
6   of these entities who had executed a post -- executed a lock-up
7   agreement which became effective post petition on delivery to
8   the debtors.

9   I think the 1126 isn't even -- other than 1126(e) by
10  which I designate it, the whole concept -- the debtor's not
11  seeking to present these as pre-petition votes that I have to
12  determine whether they must be counted or not. This is purely
13  an 1126(e) issue where these votes were solicited contrary to
14  the provisions of the code, because these were obtained before
15  the approval of the disclosure statement under 1125.

16  I think solicitation, while respectfully Century
17  Glove says it cannot be read --

18  MR. DeFRANCESCHI: Broadly.

19  THE COURT: -- broadly, I think to find that
20  obtaining a lock-up agreement in this form is not a
21  solicitation of a vote, would mean eviscerating that from the
22  bankruptcy code completely. Because if this is not soliciting
23  a vote is favor of the debtor's plan, I don't know what is.

24  And although it has conditions to actually signing
25  the ballot, those conditions, in my opinion, are not -- are not

1 significant, and I think that rather than have creditors
2 uncertain about whether or not they are bound by such
3 agreements, given post petition action -- activities, I think
4 the better procedure is simply to state that post petition
5 lock-up agreements have no role in a bankruptcy case.

6 I do not -- I disagree with counsel that it will
7 inhibit negotiations for a consensual plan, but I think that
8 the code does contemplate that all parties can continue to
9 negotiate and receive full access to information under the
10 bankruptcy code about the debtor and get to exercise their free
11 will up until the moment they cast that ballot. And I think
12 this would inhibit that.

13 MR. DeFRANCESCHI: Your Honor, as a clarification,
14 did Your Honor also rule that with respect to the fact that the
15 debtors are not seeking to count the pre-petition vote of NCI,
16 that essentially following up on what Your Honor said, that
17 removes it from the Court's consideration?

18 THE COURT: Well, I am only designating the Motorola
19 and the signing noteholders or bondholders, which was, I think,
20 Exhibit C to the Gilker -- Exhibit D to the Gilker affidavit.

21 MR. DeFRANCESCHI: There were a total of four
22 agreements. I know which ones you mean, Your Honor.

23 THE COURT: Yeah, Nextel, which signed its lock-up
24 agreement and delivered it pre-petition. That lock-up
25 agreement in and of itself does not cause me to designate their

1 vote.

2        MR. DeFRANCESCHI: So, in terms of a bright line

3 ruling to take from this, if I could, Your Honor, post petition

4 lock-up agreements that are similar to this one are -- and who

5 knows what other types, are just prohibited under 1125(b).

6        THE COURT: Correct.

7        MR. DeFRANCESCHI: And with respect to this type of

8 agreement pre-petition, before you file the petition, as long

9 as you're not seeking to rely on that to vote as a vote --

10        THE COURT: As the vote. That's a different

11 standard, and you're not -- so I need not --

12        THE COURT: You're not ruling on that.

13        THE COURT: -- deal with that standard.

14        MR. DeFRANCESCHI: Right.

15        MR. DENNY: Your Honor, Robert Denny from Morris

16 Nichols on behalf of the ad hock bondholders, whose votes have

17 now, I guess, just been designated.

18        The question we have -- ane Mr. Kreller raises on

19 remedy, your concern is that somehow we were coerced into

20 voting by designating. You're saying that we don't have any

21 voter voice on the vote at all?

22        We just want to understand the implication, 'cause

23 designating means that our vote --

24        THE COURT: Not for today.

25        MR. DeFRANCESCHI: Your Honor, to that point I did

1  not under -- I do not understand Your Honor to be passing on
2  any other contractual agreement contained in the lock-up
3  agreement or any obligations that any of the parties may have
4  to follow through with the term sheets or any of the other
5  provisions.  It's just specifically as to the vote; is that
6  correct?

7       THE COURT:  I'm only exercising 1126(e) and
8  designating the votes as not being counted.

9       MR. DeFRANCESCHI:  So that with respect to meeting
10 the two-thirds and one -- more than one-half voting
11 requirements with the class, these do not count.

12       THE COURT:  These do not count.

13       MR. DeFRANCESCHI:  Yes.

14       MR. DENNY:  And on the never you're talking about
15 this specific vote on this plan.  In other words, if there was
16 something to happen three months from now --

17       THE COURT:  I don't know what will happen, 'cause I'm
18 not making any ruling.

19       MR. DeFRANCESCHI:  With that, Your Honor, I suppose
20 the only issue left is what I believe in all the time I've been
21 practicing -- I don't know that anyone has ever sought
22 sanctions against me for activities like this.  This motion was
23 filed as a motion for sanctions by the United States Trustee.
24 I do not -- and he specifically mentions that money damages may
25 be appropriate here.  I just do not see that they've made any

1 case for that here.

2 THE COURT: Well, let me hear from the U.S. Trustee
3 on that.

4 MR. DeFRANCESCHI: I think it's inappropriate.

5 MR. McMAHON: Your Honor, good afternoon, Joseph
6 McMahon for Donald Walton, the Acting United States Trustee.
7 Your Honor, while the case certainly provides a basis for the
8 assessment of sanctions, if the Court deems it appropriate in
9 its discretion, as the record stands at this point we can't
10 attribute any malicious intent to any of the entities with
11 respect to the solicitation process here, that there was some
12 untoward or wrong purpose that was trying to be achieved by
13 them.

14 With respect to that section of the motion, Your
15 Honor, we certainly leave it to the Court's discretion based
16 upon the factual record.

17 THE COURT: Well, I don't find any basis to award
18 sanctions, so I'll deny that relief.

19 MR. DeFRANCESCHI: Your Honor, I assume Mr. McMahon
20 will submit a form of offer which we would like to see before
21 it's submitted to Your Honor.

22 THE COURT: All right.

23 MR. DeFRANCESCHI: The next matter on the agenda is
24 the motion to essentially equitably subordinate NCI, and that
25 is filed by Cordillera, I believe, and we have counsel for

1 Cordillera and for NCI here to present that.

2 I know Your Honor as a 2 o'clock.

3 THE COURT: Um-hum.

4 MR. DeFRANCESCHI: I don't -- we have what I'll call,

5 perhaps, the main even yet to come. I understand the 2 o'clock

6 hearing may not be a lengthy hearing. I don't know if Your

7 Honor -- how you want to proceed.

8 THE COURT: Well, maybe this might be a good time to

9 break and have you come back immediately after 2:20, 2:30.

10 MR. DeFRANCESCHI: 2:30?

11 THE COURT: 2:30? All right, we'll recess until

12 2:30.

13 MR. DeFRANCESCHI: Thank you, Your Honor.

14 THE COURT: Thank you.

15 (Recess)

16 THE COURT: Back again.

17 MR. DeFRANCESCHI: Your Honor, Dan DeFranceschi. One

18 clarifying point, not so much on the ruling, but on something

19 that was brought up at the prior piece of this hearing, and

20 it'll help us in preparing for confirmation. Due to the

21 designation, if the Court were -- the Court's designating the

22 Motorola votes which are in Classes 2 and 3, they're secured

23 claims, they were the only parties in -- that was the only

24 party in those classes, and I had suggested that they would

25 consensual -- they would agree consensually to be crammed down.

1 And they are here, and they would sit -- they would stand up
2 and say we want this treatment, we want to be crammed down, but
3 Your Honor has not counted our vote for purposes of voting on
4 the plan.

5 So, we're in a conundrum whether Your Honor would be
6 in a position to rule on whether you would, you know, approve a
7 consensual cramdown such as this, or whether we'll need to put
8 on an indubitable equivalent case under 11 -- under 1129(b)(a)
9 -- I don't know the subsection. There's too many letters and
10 numbers in there for the secured claim.

11 THE COURT: Well, I'm sure you can put on that
12 indubitable equivalent --

13 MR. DeFRANCESCHI: Since --

14 THE COURT: Since there's no objection from that
15 class.

16 MR. DeFRANCESCHI: Very well, Your Honor, I
17 appreciate that.

18 THE COURT: Cordillera.

19 MR. KRELLER: Good afternoon, Your Honor, my name is
20 Glen Kreller. I represent Cordillera Communications who's
21 filed a motion before the Court seeking to subordinate the
22 claim of Nextel Communications or NCI as it's sometimes
23 referred to here.

24 As a preliminary, Your Honor, I have the originals of
25 four depositions, which I would tender to the Court since they

1 have been -- pieces of them have been designated and we will
2 refer to other pieces at cross designation. I got the
3 designation as I arrived today, so I haven't filed a cross
4 designation.

5         THE COURT: All right, you may -- thank you.

6         MR. KRELLER: Your Honor, the subject comes up under
7 510(c) of the code.

8         THE COURT: Um-hum.

9         MR. KRELLER: The issues of equitable subordination
10 generally I think require the finding of inequitable conduct or
11 unfair advantage, injury to the creditor or -- and, I should
12 say, that the subordination would not be inconsistent with the
13 bankruptcy code.

14         That's the Paper Kraft (phonetic) case, and that's
15 pretty much the guiding light on this matter, I think.

16         I believe we have to look factually at what exists
17 here today. We know that Nextel is the language I choose to
18 us, if I may, because I distinguish between Nextel and NII in
19 my mind. I can't quite bring myself to say NCI and NII. I
20 stumble.

21         THE COURT: Um-hum.

22         MR. KRELLER: We know that they're an insider.
23 They're a 99 percent shareholder of the debtor, and that most
24 times, until shortly before the term sheet was agreed to in the
25 spring, they had at least four of the seven directors of the

1 debtor company as their designees.

2 The -- if you add to the fact that Motorola is also
3 an insider in this case and they control or at least influence
4 significantly Nextel, because they have a 14 percent
5 shareholding position and designate the ability to designate up
6 to two directors. That becomes important when considering what
7 the plan is a little later, and I put that out as a piece of
8 the entire puzzle here.

9 In reference to the 10K that was filed by NII, 12/31
10 of 1901 -- or 1921 -- strike that 2001. I'll get the century
11 right in a moment. NII had never cash flowed a sufficient
12 amount to pay its operating expenses. In its entirely history
13 it did not do that.

14 In fact, Mr. Lindal (phonetic) in his deposition said
15 to this date neither has the parent company, Nextel, cash
16 flowed to that degree.

17 The significance of that is that it required NII to
18 always seek the capital market for funds with which to operate,
19 and in doing so they got to be a very over leveraged company.
20 That's I guess why they're here today. They have something
21 like $2.7 billion in debt --

22 THE COURT: Um-hum.

23 MR. KRELLER: -- and I regret to say that my client
24 is a small part of that. We've been referred to in the papers
25 as a disgruntled creditor.

1    THE COURT:  Um-hum.

2    MR. KRELLER:  We only have a $28 million debt, Your
3    Honor.  And I suppose that's small in comparison.

4    The interesting structure that developed in this case
5    was the fact that in August, July and August, of 2001 Nextel
6    determined two things.  Nextel determined that they had just
7    finished putting in $500 million of capital infusion into NII.
8    They did so in March and in July of 2001.  And they determined
9    that NII did not have any recourse to capital markets other
10   than through Nextel.  That was their only source of capital.

11   They had a commitment which they publicly announced
12   to make an additional $250,000 infusion by means of a secured
13   loan, but there was some difficulty apparently with the
14   security for that loan, and they did not make that third
15   tranche of $250 million to NII.

16   Instead, at the beginning of August, they commenced
17   discussions internally at Nextel for the restructuring --

18   THE COURT:  Well, excuse me.  Am I going to hear
19   testimony, or are these facts all conceded?

20   MR. KRELLER:  I believe the facts are not disputed
21   about which I'm addressing the Court, and I would be pleased to
22   put on testimony.

23   THE COURT:  Because I have -- because I haven't read
24   the depositions.  Are these facts disputed?

25   MR. EDWARDS:  Many of the facts that I've heard so

1    far, Your Honor, are disputed.

2            MR. KRELLER:  In that event, Your Honor --

3            THE COURT:  All right.

4            MR. KRELLER:  -- I'll refer the Court to deposition

5    testimony.  The witnesses that I would normally present are not

6    present.  We've deposed several.  I don't know -- what when

7    this is -- I didn't do all the depositions myself, but I can

8    refer the Court to the deposition testimony, and I will do so.

9            The reference to non-profitability is found at

10   Lindal's deposition at Page 29.  Also the reference to the

11   parent company's failure to be profitable during that same

12   period of time.

13           THE COURT:  What was that page reference?

14           MR. KRELLER:  Page 29, Your Honor.

15           The next subject where I begin to talk about the

16   determinations by Nextel of the need to restructure the debt is

17   found in Exhibit 10 to the Lindal deposition, and the

18   references are throughout the deposition, but Exhibit 10 is

19   identified as a memorandum to Mr. Lindal from Mr. Britton

20   (phonetic), who as then the treasurer of Nextel, inviting the

21   parties, who consisted of Mr. Donahue, the president of Nextel,

22   two other directors of Nextel and Mr. Lindal to a meeting to

23   discuss the restructuring of NII debt.

24           That exhibit is attached as Exhibit 10 to the

25   deposition.

1  In the reference to the $500,000 of infusion and the
2  $250,000 secured loan is found in the Shindler deposition at
3  Page 47 to 52.

4  The Britton memo to which I've referred, that is
5  Exhibit 10 to the Lindal deposition, is significant because it
6  begins the discussion of restructure at that time. This is not
7  involving the debtor. This is involving the parent company,
8  and there is an appendage to that memorandum which emphasizes
9  the need for extreme confidentiality of that discussion.

10  Mr. Shindler and Mr. Lindal both testified -- Mr.
11  Lindal at Pages 18 to 20 of his deposition -- that the loan was
12  finally not made, and during the fall of 2001 discussions began
13  between Nextel and NII about restructure.

14  Prior to that time, however, Mr. Shindler reported at
15  Pages 53 to 55 and Mr. Lindal at Pages 12 to 16, that Nextel
16  acquired two positions of bonds or notes in the -- in swap
17  transactions, swapping for those notes Nextel common stock,
18  which they issued and subsequently registered.

19  That became publicly announced in August -- on August
20  27th in a 10K which was filed -- or an 8K which was filed with
21  the Securities and Exchange Commission.

22  The stock value was about 30 percent of the face of
23  the bonds, $857 million worth of bonds and the stock at about
24  30 percent of that, necessitating the taking by Nextel of a
25  $469 million extraordinary gain as reference in their 10Q filed

1 for the period ended September 30, 2001.

2 At this point I think it's important to compare the
3 emphasis in Mr. Britton's memo of August 3, which is Exhibit
4 10, and what occurred in the acquisition of those bonds. Mr.
5 Britton emphasized that they could take the bonds and they
6 could improve the cash flow position of the subsidiary because
7 the debt service would not be required.

8 What happened was that Nextel did not do that. They
9 chose to keep the bonds as an active position requiring NII to
10 continue to be liable for those bonds. It's perfectly
11 legitimate transaction, and I don't have any question that
12 ordinary accounting did improve the balance sheet of the
13 consolidated companies by reducing that amount of debt, but it
14 did not improve the position of NII.

15 Nextel did take the gain, and they reported it in
16 their 10Q. And Mr. Lindal referred to that in his deposition
17 at Pages 118 to 119 to that effect.

18 During the fall Mr. Lindal was then placed upon a
19 committee of people from Nextel to negotiate the restructure of
20 NII, and that resulted in the tendering to NII of a term sheet
21 in December, December 17th of 2001, and that is an exhibit to
22 the -- it's Exhibit -- I'm going to have to give the Court a
23 reference in a moment. I've lost my note as to that exhibit
24 number, but it's an exhibit in the Lindal deposition, and it is
25 a term sheet which proposed the parent company to engage in a

1 restructure of the debt by issuing 100 percent of the common
2 stock of NII to all of the unsecured creditors and with Nextel
3 putting in $250 million of new capital for preferred shares
4 which would be convertible into 50 percent of the stock if it
5 were converted.

6      So, to place it in a little bit different picture, we
7 had a $250 million, 50 percent interest in the creditors, and a
8 $250 million interest in the new stockholder position.  That
9 was the proposal that Nextel made.

10      It is that proposal that started the discussions
11 which ultimately led to the term sheet, which forms the basis
12 of the plan in this case, in which 140 million equals 80
13 percent of the company, and 20 percent is reserved for the
14 unsecured creditor class.  But that's not quite right, because
15 the unsecured creditor class doesn't exist as a class in this
16 case.

17      There are four classes of unsecured debt in this
18 case.  There are two Motorola classes, there is a bondholder
19 class, and there is the also-rans of which Cordillera is one of
20 two.  The other one is NCI.  Those are the breakdowns of the
21 classes.

22      Now, I'm not going to get into the classification
23 argument at this point in time.

24      THE COURT:  All right.

25      MR. KRELLER:  This is the subordination argument.

1 But the point of the whole argument is simply this. That the
2 harm to the creditors is that we have lost 50 percent of the
3 company, if that was the value, and certainly Nextel had reason
4 to know that that was the value. They were the insiders. WE
5 have lost that value. We now have 20 percent of a company, of
6 which 80 percent is valued at $140 million, according to the
7 plan.

8       That's the damage that's done to these creditors.
9 They have not been included in the discussions, the
10 negotiations or any other part nor have they been able to post
11 plan to negotiate, because there was a lock-up agreement that
12 prohibited anybody from changing the plan. And that was the
13 discussion with which we faced when we tried to negotiate.

14       If you're looking for harm, that's the harm. The
15 conduct is what happened was that Nextel bought themselves with
16 their stock at no cash outlay and no benefit to the debtor, no
17 infusion of cash to the debtor, they bought themselves an $857
18 million place at the table. That's 30 percent of the bonds --
19 37 percent of the bonds, and they became a dominant negotiating
20 party in that class.

21       We think that violates the fiduciary duty that Nextel
22 had to NII, because as Mr. Shindler states in his deposition in
23 that pages that I've cited, he had no notice and no knowledge
24 the company, NII, did not know Nextel was acquiring those bonds
25 until they were acquired. And if I read the cases correctly,

1 Your Honor, that alone in this circuit is sufficient to
2 subordinate a claim.

3      That's what the case says, and I think, Your Honor,
4 when there's no notice by the fiduciary that that is
5 sufficient, they've got to follow their fiduciary trail, and
6 they've got to deal with the debtor as a fiduciary. They're
7 parents. The Nextel designated directors are the ones
8 mentioned in Mr. Britton's memo that are confidential
9 negotiators and planners for the restructure.

10      They started that process two months before NII was
11 brought into the process. They bought the bonds, they formed
12 their committee, they started doing their negotiation. That's
13 the way the scenario reads when you -- pardon me, when you
14 reexamine the depositions that are before the Court that I've
15 referred to.

16      I would add one more factor. In Mr. Juliss's
17 (phonetic) deposition, which is before the Court, he refers at
18 Pages 33 to 47 to Exhibit 4, which is a letter that he wrote,
19 which precipitated the discussions with the noteholders and got
20 the noteholders into the case. He was a noteholder, but he
21 laid out the damage, he laid out the whole history, and it's
22 frankly without that road map that Cordillera probably would
23 not be here today, because we would not have had notice or
24 knowledge of any of these events. They just happened. They
25 happened so slick, they happened so carefully, but they